FILED
2021 Jan-05  AM 11:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

**KORD TECHNOLOGIES, LLC,**

        *Plaintiff,*

v.

        Civil Action No. _____

**JOHN LLOYD DENDY; A-TECH**
**CORPORATION AND A-TECH, LLC,**

        *Defendants.*

## VERIFIED COMPLAINT

Plaintiff Kord Technologies, LLC ("Kord"), for its verified complaint against Defendants John Lloyd Dendy ("Dendy"), A-Tech Corporation and A-Tech, LLC,[1] shows the Court as follows:

### Introduction

This is an action for injunctive relief and damages arising out of Dendy's theft of Kord's trade secrets.

Dendy, a long-time Kord employee, resigned on November 20, 2020. Before his resignation, Dendy had a central role in developing Kord's laser

---

[1] A-Tech Corporation and/or A-Tech, LLC do business under the trade name "Applied Technology Associates."  A-Tech Corporation and A-Tech, LLC are referred to, collectively, as "ATA."

weapons programs.  Kord paid Dendy well, gave him regular bonuses and raises, and even paid his tuition towards a cybersecurity master's degree.  In order to perform his software development and systems engineering job duties Dendy had access to Kord's most valuable trade secrets — secrets that make Kord's laser programs, and the millions of dollars in government contracts they earn each year, possible.  Dendy unlawfully downloaded thousands of documents from Kord's computer systems prior to leaving Kord and has attempted to cover his tracks by erasing data from his Kord provided electronic devices.  Worse yet, Dendy conspired with his new employer, ATA, in unlawfully misappropriating Kord's trade secrets.

Immediately after he resigned, Dendy went to work on ATA's directly competitive laser programs.  Dendy initially attempted to conceal his new employment with ATA by misrepresenting his post-resignation plans to his former Kord supervisors.  What Dendy actually did is much worse than a former employee joining a competitor.  Shortly before resigning, Dendy violated the terms of his employment by downloading thousands of documents, many of which contained trade secrets and other proprietary information from Kord's laser programs.  Dendy took those documents with him to Kord's direct competitor, ATA.  Dendy also took to ATA at least one Kord-issued laptop full of similar trade secrets and proprietary information.  Kord asked Dendy to return the laptop, and

Dendy initially refused, falsely claiming that the laptop was a "gift."  In the meantime, on December 1, 2020, Dendy (or someone using his credentials) accessed Kord's trade secrets from an IP address located in Albuquerque, New Mexico, hometown of ATA.

Dendy went to great lengths to cover up his illegal theft of Kord's trade secrets.  He downloaded Kord's trade secrets in the dark of night, well outside of normal business hours, between midnight and 1:30 a.m.  And before returning his Kord-issued computer devices, he erased the content of at least three of them, including the laptop he took with him to ATA.  By reinstalling the operating system on two Kord provided laptops, Dendy essentially overwrote electronic data that previously resided on those devices' hard drives, Dendy has attempted to obscure the full extent of his illegal conduct and the damage he's done to Kord.

And now, while Kord works diligently to assess the full extent of the damage he has done, Dendy continues to work ATA, the direct competitor with which he has shared Kord's trade secrets.  Dendy and ATA are using Kord information to compete against Kord unfairly and unlawfully.

This Verified Complaint describes Kord's trade secrets, and Dendy's unlawful activities, in great detail.  The Verified Complaint also explains ATA's complicity in Dendy's misdeeds.  This case calls out for emergency and permanent

injunctive relief, in addition to compensatory and exemplary/punitive damages. The Court should enter judgment in Kord's favor.

## The Parties

1.      Kord is a Delaware limited liability company.  For diversity purposes, its member is Wyle Inc., a Delaware corporation with its principal place of business in Torrance, California.

2.      Dendy is an Alabama citizen.

3.      A-Tech Corporation is a New Mexico corporation with its principal place of business in New Mexico.

4.      A-Tech, LLC is a New Mexico limited liability company.  Upon information and belief, for diversity purposes, its member is ATA Holdings, Inc., a New Mexico corporation with its principal place of business in New Mexico. Upon information and belief, A-Tech, LLC is the successor-in-interest to A-Tech Corporation.[2]

---

[2] Upon information and belief, from 1975 until October of 2020, ATA conducted its business as Applied Technology Associates, Inc., which was organized and headquartered in New Mexico. In October of 2020, A-Tech Corporation acquired Applied Technology Associates, Inc.'s stock. It then merged or converted A-Tech Corporation into A-Tech, LLC.

## Jurisdiction and Venue

5.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Counts I and II arise under the laws of the United States. The Court has supplemental jurisdiction over Counts III-XI under 28 U.S.C. § 1367 because they are part of the same case or controversy.

6.      This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because (a) there is diversity of citizenship between Kord and the defendants; and (b) the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

7.      The Court has personal jurisdiction over Dendy because he is an Alabama citizen.  The Court has personal jurisdiction over ATA because it purposefully availed itself of the benefits and privileges of the State of Alabama, purposefully directed activity towards the State of Alabama, and committed intentional torts intended to, and which did, cause harm in Alabama.

8.      Venue is appropriate in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Kord's claims occurred in this district.

## Factual Allegations

### Kord and its directed energy systems work

9.     Kord supports our nation's military by providing services to the U.S. government and, particularly, the U.S. Department of Defense, under a number of prime contracts and subcontracts.  Central to this case is Kord's Directed Energy Systems (DES) division, which develops state-of-the-art laser weapons systems.

10.     Kord's DES division spans three specific programs.  The first is Kord's **I**nternal **R**esearch **A**nd **D**evelopment or "IRAD" program.  Under IRAD, Kord develops technologies and systems for potential military use.  Over the last several years, Kord has invested millions of its own IRAD dollars into the development of High Energy Laser or "HEL" systems to support existing and anticipated military requirements.

11.     The second of Kord's three DES programs is its Directed Energy-Maneuver Short Range Air Defense or "DE-MSHORAD" program.[3]  This program supports the U.S. Army's effort to develop a vehicle-mounted HEL weapon system to protect convoys from enemy drones.  Kord's DE-MSHORAD work supports the

---

[3] DE-MSHORAD is the successor to Kord's work for the U.S. Army's Multi-Mission High Energy Laser or "MMHEL" effort.

Army under two Other Transaction Authorities or "OTAs"[4] worth many millions of dollars annually.

12.     The third Kord DES program is its HEL SWORD program for the U.S. Air Force.  Like its sister programs, HEL SWORD involves development of ground-based laser weapons to counter enemy drones.  In October of 2020, Kord won a Phase 1 OTA prototype contract with the Air Force to develop a prototype system.  (As discussed below, ATA also won a Phase 1 OTA prototype contract.) Prototypes must be delivered by September of 2021.  Then, after an evaluation period of up to 12 months, the Air Force is expected to select between Kord's and ATA's competing prototypes for a Phase 2 production contract worth hundreds of millions of dollars.

13.     As part of its IRAD program, Kord has developed novel and valuable methods for tracking drones that are unknown to its competitors.  Kord developed proprietary computer vision and machine learning techniques and algorithms designed to provide more robust target acquisition and tracking capabilities than traditional systems.  Kord also created a unique development architecture and technical approach/process to equip its systems with these enhanced target acquisition and tracking capabilities.  To enhance its IRAD program, Kord entered

---

[4] OTAs are non-FAR based government contracts the DoD uses for prototype, research, and production projects.  *See generally* 10 U.S.C. § 2371.

into strategic teaming relationships with other contractors to obtain their expertise and components.  Kord's proprietary computer vision and machine learning techniques and algorithms, its unique development architecture and technical approach/process, and its strategic teaming relationships are hereinafter referred to, collectively, as Kord's "Proprietary Tracking Technology."

14.    Kord developed a unique capture strategy designed to win the Phase 1 OTA prototype contract *and* the Phase 2 production contract.  That strategy includes delivering a prototype with enhanced target acquisition and tracking capability.  Kord intends to deploy its Proprietary Tracking Technology to meet that requirement.[5]

15.    Kord's Proprietary Tracking Technology gives it a competitive advantage in the HEL SWORD competition and future acquisitions.  By using its Proprietary Tracking Technology, Kord can deliver a technically superior product at a significant cost savings over traditional systems.  Kord expects to win work, including the HEL SWORD Phase 2 production contract, because its investment in research and development allows it to offer better products at a lower price than its competitors.

---

[5] Though the Air Force will own the prototype, Kord will retain its intellectual property and data rights, including its Proprietary Tracking Technology.

16.     Some of Kord's DES work is classified.  Kord maintains a Top Secret facility security clearance so that its cleared employees can access classified information.  As a facility security clearance holder, Kord must comply with the National Industrial Security Program Operating Manual, which generally outlines the steps and protocols Kord (and other facility security clearance holders) must follow to safeguard national secrets.  Kord takes its obligations to protect classified data very seriously and has processes and procedures in place to protect classified and unclassified government data and third-party data, as well as its own proprietary information.

17.     Kord uses cloud-based Office 365[6] and SharePoint Online[7] for document management and storage, to support the U.S. Government and in interstate commerce.  Each DES program has its own file(s) (collectively, Kord's "DES Files") on or within Office 365 and specifically in SharePoint Online

---

[6] Office 365 is a line of subscription-based services utilizing Microsoft Azure for Active Directory account authentication.

[7] SharePoint Online is a Microsoft document management and storage platform.  It integrates as a service within Microsoft Office 365.  Microsoft OneDrive is a file hosting and synchronization service.  Kord employees, including Dendy, have a "personal" (but company provided and company managed) OneDrive folder in which they can save documents.  It is "personal" in that each user has his/her own company provided OneDrive folder that only they have permission to use.  OneDrive resides on Kord's Office 365 environment and utilizes SharePoint Online as its backend environment.

18.     Kord's DES Files contain proprietary information about each of Kord's DES programs, including:

- the Proprietary Tracking Technology;

- other technical and testing data;

- system requirements and features;

- source code;

- business and financial information for each of the DES programs; and

- proposal and business development information.

19.     Kord safeguards and protects its DES Files in several ways.  As a threshold matter, it uses electronic, multi-factor authentication to prevent unauthorized access to its network.  From there, Kord restricts access to DES Files so that only the engineers, developers, and other technical employees doing DES work can access them.  (In some circumstances, certain headquarters staff with a bona fide need for the information can also access the DES Files.)

20.     In addition to technical safeguards, Kord has a number of policies and procedures that its employees must follow to safeguard the DES Files and other proprietary information.  Those include Kord's Employee Manual and Standards of

Business Conduct and Ethics.  All Kord employees, including Dendy, agreed to abide by these policies.

21.     Section 3.2 of Kord's Employee Manual specifically identified "[u]nauthorized disclosure of business 'secrets' or confidential information" as "unacceptable" conduct.  Section 3.12 made Kord's policy clear:

**3.12 Confidential Information                    (11/01/2012)**

The protection of confidential business information and trade secrets is vital to the interests and the success of Kord.  Such confidential information includes, but is not limited to, the following examples:

. . .

- Computer programs, processes and codes

. . .

- New materials research

- Pending projects and proposals

- Research and development strategies

- Technological data

- Technological prototypes

The contents of these confidential records may not be disclosed to anyone, except where required for a business purpose.  Employees who are unsure about the confidential nature of specific information must ask their manager or Human Resources representative for guidance.  Employees who improperly use or disclose trade secrets or confidential business information will be subject to disciplinary action, including termination of employment, even if they do not actually benefit from the disclosed information.

22.     Kord's Standards of Business Conduct and Ethics bolstered the

employees' obligations to safeguard Kord's proprietary and trade secret

information.  Section 6.1.8 dealt with current employees and provided:

### 6.1.8 Proprietary Information – Current Employees

Employees who have access to proprietary information owned by the
company or its customers shall not disclose any such information,
directly or indirectly, or use it for any purpose except as required in
the course of their employment with the company.

Kord's written instruction did not stop there.  It also described an employee's

obligations to safeguard information when separating from the company:

### 6.1.9  Proprietary Information – Terminating Employees

The obligation to preserve confidentiality of proprietary information
acquired in the course of employment with the company does not end
upon the termination of employment.  The obligation continues
indefinitely until the company authorizes disclosure, or until the
proprietary information legally enters the public domain.

### Dendy's work for Kord

23.     Dendy joined Kord in November 2016.  He agreed to abide by Kord's

policies and procedures including specifically the proprietary information policies

discussed above.

24.     Dendy's work required a security clearance.  To obtain a clearance, an

individual must undergo a background investigation, enter into a Classified

Information Non-Disclosure Agreement with the government (Standard Form 312), and complete initial security training (among other things). Once cleared, that individual must take annual refresher training. The individual's sponsor must ensure that he or she satisfies all applicable security obligations.

25.    Dendy holds a Top Secret security clearance. Kord sponsored Dendy's clearance.

26.    Dendy is an electrical engineer by education and his work for Kord involved software development and systems engineering and integration for its DES programs, as well as cybersecurity. Dendy's work spanned all three of Kord's DES programs, and he spent the majority of his time on and provided critical support to Kord's DE-MSHORAD and HEL SWORD programs.

27.    As part of his work for Kord, Dendy had access to the DES Files and the Proprietary Tracking Technology.

28.    Dendy was involved in developing Kord's HEL SWORD capture strategy. He also helped write Kord's proposal to the Air Force, including specifically those portions related to cybersecurity.[8] Dendy had access to the entire proposal, which laid out Kord's overall capture, development and deployment

---

[8] Dendy was pursuing a master's degree in cybersecurity when he joined Kord. Dendy took advantage of Kord's tuition reimbursement benefit so that Kord paid some of his tuition.

strategy for Kord's Phase 1 prototype proposal, as well as the Phase 2 production contract competition between Kord and ATA.

29.     After Kord won the Phase 1 OTA for its HEL SWORD prototype in September of 2020, Dendy expected to be named the chief engineer on the program.  In late September, his supervisor told him that someone else would fill that role.  The news upset Dendy so much that he had to leave work for the day.

## Dendy resigns from Kord

30.     On November 20, Dendy notified his supervisor that he was resigning from Kord and (falsely) volunteered that he was going to work for a local start-up company that had offered him an ownership interest.

31.     The next week, Ben Allison, another Kord employee who was senior to Dendy, asked Dendy directly if he was going to work for ATA.  Dendy insisted he was not.  Dendy told Mr. Allison that he was going to work for a local "start-up," called BlueHalo.  Mr. Allison knew that BlueHalo was a group of companies that includes ATA, so Mr. Allison asked Dendy again if he would be working for ATA.  Dendy told Mr. Allison that he was hired to help BlueHalo establish local information technology systems, but would have no role with ATA.  Mr. Allison warned and reminded Dendy that he had obligations to protect Kord's proprietary and trade secret information from ATA.

32.     Based on Dendy's representation that he was not joining ATA, Kord allowed Dendy to remain employed with Kord until November 27.  Unbeknownst to Kord, Dendy was already working against Kord's interests and planning to join ATA in a directly competitive position.

33.     During Dendy's employment at Kord, it issued him three laptop computers and an encrypted flash drive to use only for business purposes, including to support the U.S. government and in interstate commerce.  The first laptop was a Dell laptop that Kord issued to all its personnel for normal, day-to-day office computing.  The second laptop was a custom Falcon laptop that Kord bought with funds from its DE-MSHORAD contract, and because it was government funded, Dendy could only use the Falcon laptop for DE-MSHORAD work.  The third laptop was an ASUS that Dendy used for IRAD and HEL SWORD work.  Kord provided Dendy the encrypted flash drive to use for its Mobile Experimental High Energy Laser system under its DE MSHORAD contract.

34.     Dendy returned the Dell and Falcon laptops before he left Kord, but not the ASUS laptop or flash drive.

35.     During his exit interview, Kord presented Dendy its standard out-processing form.  That form includes a standard representation that the employee

has returned all Kord devices and information.  Dendy did not sign or return the form.  After his separation, Kord demanded that Dendy return the ASUS laptop "in its current condition with the operating system, all data, and files, etc. intact."  Dendy did not deliver the ASUS laptop or flash drive to Kord until the morning of December 18.

## Kord discovers Dendy's dishonesty

36.    After Dendy separated, Kord learned that he was working for ATA at its Huntsville location, contrary to his earlier misrepresentations.  Once it discovered Dendy's dishonesty, Kord began investigating Dendy's account.  Despite his attempts to conceal his actions, Kord has gathered information about Dendy's improper pre- and post-separation activities.

37.    Specifically, on November 12-13 (approximately one week before he announced his resignation) Dendy downloaded 2,746 unique documents from his OneDrive account within Kord's Office 365 cloud environment to another device(s).[9]  Dendy was very busy between approximately midnight and 1:30 a.m. on November 13, when he downloaded 2,682 of these 2,746 documents.  For context, Dendy downloaded over 2,700 more documents during these two days than he had in September and October 2020 combined.  A true and correct copy of

---

[9] Kord has made required notifications to the appropriate government agencies.

the list of unique documents Dendy downloaded from Kord's DES Files between November 12 and 13 is attached hereto as Exhibit A.

38.     Kord also found evidence in Dendy's office that he possessed a device designed to enhance downloading speeds to external hard drives.

39.     In connection with his November 12-13 downloads, Dendy also deleted scores of files from his OneDrive account.  Indeed, Dendy took the time to do a second-stage deletion, meaning that he deleted files, then deleted them from the deleted-files folder, and then deleted them again in order to leave no trace of them on Kord's systems.  A true and correct copy of the list of files that Dendy deleted from November 12-13 is attached hereto as collective Exhibit B.

40.     Kord has identified several indexes for web applications that were deleted, and have yet to be able to restore those files.  Without the indexes, the applications are difficult, if not impossible, to use.  Kord is still assessing the viability of a copy of the web application that remain in its possession to ensure that it has not permanently lost the important files that enable the application to function.

41.     On November 18, Dendy returned to Kord's SharePoint Online system and downloaded 36 documents to another device(s).  A true and correct

copy of the list of unique files Dendy downloaded from Kord's SharePoint Online system on November 18 is attached hereto as Exhibit C.

42.     Around 11:50 p.m. on November 25, Dendy returned to his OneDrive folder and downloaded 39 files.  A true and correct copy of the list of unique files Dendy downloaded on November 25 is attached hereto as Exhibit D.

43.     Although his last day with Kord was November 27, Dendy — or someone to whom he gave his credentials — accessed Kord's SharePoint Online system on November 28 and December 1.  On November 28, Dendy — or someone to whom he gave his credentials — accessed his company email, as well as six documents from his OneDrive account.  A true and correct copy of the logs reflecting the November 28 activity is attached hereto as Exhibit E.  And on December 1, Dendy — or someone to whom he gave his credentials — logged into Kord's SharePoint system and viewed two documents from Kord's DES Files.  A true and correct copy of the logs reflecting the December 1 activity is attached hereto as Exhibit F.

### Dendy misappropriated Kord's trade secrets and will inevitably use and disclose them

44.     The documents Dendy downloaded from Kord's DES Files before he resigned, and viewed after he left, contain Kord's proprietary information, including the Proprietary Tracking Technology.

45.     Kord's Proprietary Tracking Technology begins with commercial algorithms and high-powered computing systems.  Kord has written proprietary software to sequence the algorithms with other inputs and control the way they are processed.  This Kord-developed process produces proprietary artificial intelligence training models that Kord uses to teach its HEL SWORD system to acquire and track targets and meet Kord's established performance thresholds and specifications.  A competitor — like ATA — could use Kord's proprietary models to train competing systems and replicate its Proprietary Tracking Technology. Dendy downloaded 1,023 of these models, source code and training images from Kord's SharePoint Online system on November 13.  (*See* Exhibit A at items 901-1223, 1287-1938, 2076-2125, 2137.)

46.     The first document Dendy viewed on December 1 was an internal HEL SWORD requirements review presentation, which was labeled as proprietary information.  It contains the performance thresholds and specifications mentioned above.  Kord's HEL SWORD system is technically superior to other systems.  If a

competitor — like ATA — knew Kord's performance thresholds and specifications, it would gain a significant advantage in designing a competing system that meets or exceeds them.

47.     The second document Dendy viewed on December 1 was labeled Kord proprietary.  It was a presentation for a new radar program in which Kord will apply some of the same machine learning techniques it uses in HEL SWORD.  The presentation outlines Kord's planned technical approach for that contract.  A competitor — like ATA — would have a distinct advantage if it knew Kord's planned technical approach to meet contract requirements.

48.     Before he resigned, Dendy also took proprietary information related to Kord's DE-MSHORAD program.  The document shown on Exhibit A at item 2639 is an April 2020 design review presentation for the DE-MSHORAD system.  It is labeled as proprietary information.  The presentation contains Kord's proprietary system design, specifications, configurations, and performance requirements.  This information is controlled by the International Traffic in Arms Regulations, 22 C.F.R., Subchapter M ("ITAR"), meaning that the U.S. government prohibits its release to foreign persons without prior authorization.  Dendy downloaded this document on November 13.  (Exhibit A at item 2639.)  A competitor, like ATA, could replicate Kord's DE-MSHORAD system with this information.

49.     Many of the other files Dendy downloaded from Kord's DES Files contain similar "technical," "scientific" or "engineering" information about Kord's DES programs, including DE-MSHORAD and HEL SWORD.  The other documents contained confidential, proprietary and trade secret information about each of Kord's DES programs, including:

- the Proprietary Tracking Technology;
- other technical and testing data;
- system requirements and features;
- source code;
- business and financial information for each of the DES programs; and
- proposal and business development information.

50.     For example, Dendy also took Kord's HEL SWORD proposal to the Air Force as part of his late night downloading session on November 13.  (See Ex. A at items 888, 2635, 2743-2746.)  The proposal contained "technical," "scientific" and "engineering" information to be sure, but it also contained Kord's proprietary price and costing (i.e., "business") information.

51.     Dendy was not authorized to access, much less download, documents in Kord's DES Files other than for legitimate business purposes.  Dendy had no legitimate business reason for the November 12-13 or 18 downloads, less than one week before he resigned.  He also had no legitimate business reason for the November 25 downloads.  By downloading the files, Dendy violated Kord's

Standards of Business Ethics and Conduct and Kord's Employee Manual, both of which he agreed to in writing.  Further, Dendy had no authorization to access Kord DES Files for ***any*** purpose after his termination on November 27.

52.     Kord has not been able to retrieve the downloaded documents from the devices that Dendy returned.  A forensic examination of the ASUS laptop revealed that Dendy installed a new Windows 10 operating system the day before returning it to Kord, effectively erasing its contents by overwriting the previous Windows operating system and data.  Kord's forensic examination recovered a partial list[10] of the files Dendy erased from the ASUS laptop.  On the evening of November 18 — on the heels of Dendy's massive surreptitious downloading campaign, and two days before he resigned — Dendy created two zip files[11] titled "OneDrive_2020-11-18" and "OneDrive_1_11-18-2020."  He also created an Excel file named "laser registration tablesATA_Template."[12]  A true and correct copy of the recovered downloads file listing from the ASUS laptop is attached hereto as Exhibit G.  Dendy's actions also make it difficult (if not impossible) to

---

[10] Due to Dendy's actions, the files themselves are not recoverable.

[11] Zip files contain one or more files compressed for storage and/or transmission.

[12] At some point, Dendy also created a folder called "ATA" on the desktop of the Dell laptop.

determine what other devices, such as external hard drives or thumb drives, he may have attached to the ASUS laptop and moved files to.

53.     Kord has also determined that Dendy reinstalled the operating system on the Falcon on November 23, effectively erasing its contents as well and obscuring whether he moved files from it to hard drives, thumb drives or other devices.  Dendy's actions not only erased any of the downloaded documents he may have stored there, but also files related to work he performed on the DE-MSHORAD program.

54.     Dendy also reset the flash drive and erased its contents.  Again, Dendy's actions not only erased any of the downloaded documents he may have stored on the flash drive, but also the files related to his work.

**ATA's involvement in Dendy's activities**

55.     ATA is very active in the Directed Energy space.  It operates an Acquisition, Tracking and Pointing or "ATP" division, which is directly competitive to Kord's DES division.

56.     ATA is a vendor to Kord on its DE-MSHORAD program.  But, rather than teaming with Kord on its HEL SWORD program, ATA competed for, and won, its own Phase 1 OTA prototype contract.  ATA is now developing its own

prototype which it calls "LOCUST."  At least as to the HEL SWORD program, ATA and Kord are direct competitors for the Phase 2 production contract and potentially hundreds of millions of dollars in revenue.  Like Kord, much of ATA's DES work is done by its Huntsville employees in its Huntsville office.

57.     In 2019, Dendy told his supervisor at Kord that ATA was actively pursuing him to join its ATP division.  Kord offered Dendy an out-of-cycle raise to keep him.  In fact, Kord gave Dendy generous raises and bonuses every year as a way of rewarding his performance *and* retaining his services.  Kord also offered tuition reimbursement for Dendy's master's degree well above Kord's standard policy.

58.     Larry Lloyd is ATA's vice president of business development.  Mr. Lloyd is heavily involved in ATA's Huntsville operations and particularly its ATP division.  Mr. Lloyd frequently travels to Huntsville as part of his duties for ATA.

59.     On information and belief, Mr. Lloyd was the ringleader for ATA's efforts to recruit Dendy.  Since at least June of 2019, Mr. Lloyd and others at ATA

have been secretly blind copying Dendy on emails sent to Kord leadership.[13] These emails had nothing to do with Dendy's work for Kord.

60.     As discussed above, Dendy accessed Kord's SharePoint Online system without authorization on December 1.  Dendy's actions, standing alone, are problematic.  But the most troubling thing is that Dendy (or the person using his credentials and multifactor authentication code from his cell phone security application) used an IP address[14] tied to an internet service provider registered in Albuquerque, New Mexico.  (See Ex. F.)

61.     Dendy does not live or work in New Mexico, but ATA is headquartered in Albuquerque.  *See* www.atacorp.com/contact.html.

62.     It also appears that Dendy was working for ATA, or at least on its behalf, while he was still on Kord's payroll.  On December 3, 2020, Mr. Lloyd wrote to Mary Clum, ATA's vice president of programs, and Catherine Wahler, its payroll specialist, as follows:

> Mary
> I need Lloyd D approved to charge against 4050-112
> (ATP BD OH). Can you please re-approve? I've included
> Lloyd in this update.

---

[13] Kord discovered that Dendy received these emails during its post-separation investigation of Dendy's accounts.

[14] An IP, or "Internet Protocol," address is an identifying number tied to the hardware being used to connect to a network.

Cathy
Please let Lloyd know when this is approved. Thanks…

Larry

Mr. Lloyd copied Dendy at his ATA email address.  But when Ms. Clum

forwarded that message, she copied Mr. Dendy at his Kord email address[15] and

attached an ATA Site (High-Rate) Overhead (OH) Request Form listing Dendy as

one of the ATA employees eligible to charge to that timecode.  A true and correct

copy of this email chain, and the Request Form, is attached as collective Exhibit H.

63.     The ATA Request Form, with Dendy's name on it, bears Mr. Lloyd's

electronic signature dated April 29, 2019.  (See Ex. H.)  Ms. Clum's electronic

signature is dated October 18, 2020.  (*Id.*)  Dendy was a **Kord** employee on both

days, and at all times in between.

64.     The employees on the ATA Request Form bill their time as overhead

to ATA's "Acquisition, Tracking and Pointing (ATP) Campaign."  (*Id.*)  The

Request Form described the scope of work that Dendy and others will perform

under that charge code as:

> The scope of this effort covers the BD, technical and
> programmatic support activities associated with the

---

[15] The email address reflects an @centauricorp.com domain because Centauri is Kord's
immediate parent company.

> pursuit of opportunities for the Acquisition, Tracking and
> Pointing (ATP) campaign.  The activities include
> technical interchange meetings, producing technical
> marketing and pre-proposal materials.

(*Id.*)  Dendy and the other listed ATA employees must produce certain

"deliverables" or work product: "Technical Interchange Meetings, Technical

Marketing Materials, Pre-Proposal Materials certain deliverables."  (*Id.*)

65.     As mentioned above, ATA's ATP line of business includes its

LOCUST weapons system.  *See* http://www.atacorp.com/atp.html.  Not only did

Dendy intentionally misrepresent his plan to join ATA, but he accepted a position

that is virtually identical to the one he held at Kord.  He is now supporting ATA,

Kord's direct competitor, on directly competitive programs and projects in its ATP

line of business.  Worse, Dendy helped himself to thousands of documents from

Kord's DES Files, including those containing its Proprietary Tracking Technology,

on his way out the door.

66.     Kord's competitive position in the directed energy and laser industry

would be devastated if Dendy were allowed to bolster its competitors' DES efforts

with Kord's trade secrets.  That is particularly true of Kord's HEL SWORD

program, where its prototype will compete, head-to-head, with ATA's LOCUST

prototype for a Phase 2 production contract worth hundreds of millions of dollars.

The competition will come down to the Air Force selecting between Kord's HEL

SWORD program, which Dendy used to support, and ATA's LOCUST program, which Dendy now supports.  The threat of disclosure under these circumstances — which Dendy tried to conceal from Kord — is clear.  In fact, disclosure is inevitable because Dendy is supporting ATA's ATP programs, and performing his overlapping duties, with the benefit of thousands of Kord's trade secrets.  And it looks like this was Dendy's and ATA's plan all along.

67.     Kord will suffer immediate, irreparable harm if Dendy is permitted to disclose its proprietary and trade secret information to ATA (or otherwise), or to use the information for himself or on ATA's (or anyone else's) behalf.  Similarly, Kord will suffer immediate, irreparable harm if ATA is allowed to acquire, further acquire, disclose or use Kord's proprietary and trade secret information.

68.     Dendy's and ATA's conduct was so willful, malicious, intentional, wanton and reckless, and displayed such an utter disregard for Kord's rights as to warrant the imposition of punitive/exemplary damages.

## Count I – Misappropriation of Trade Secrets
## Under the Defend Trade Secrets Act 18 U.S.C. § 1836

69.     Kord adopts and incorporates by reference the allegations in the preceding paragraphs, as if fully set out herein.

70.     Kord owns the documents Dendy downloaded from the DES Files on Kord's SharePoint Online system, including those identified on Exhibits A, C and D.  Those documents contain, among other things, Kord's Proprietary Tracking Technology, which is reflected in the source code and other compilations that Dendy downloaded.  Kord uses this information in its business, including interstate commerce.

71.     The information Dendy downloaded is not publicly known, or even generally known in the directed energy or laser industries.  And it cannot be reasonably ascertained or derived from publicly available information.  Kord took reasonable measures to ensure that this information was kept secret including, among other things, limiting access to the information, marking relevant documents with a proprietary legend, and enforcing applicable policies and procedures.  The information Dendy took from Kord has significant economic value particularly as it relates to Kord's DES programs.  Therefore, the information Dendy downloaded was trade secret information under 18 U.S.C. § 1839(3).

72.     Dendy had a duty to protect and maintain the secrecy of Kord's trade secrets.  He breached that duty by downloading Kord's trade secrets and taking them with him to ATA where he plans to work on programs directly competitive to

Kord's DES division.  Therefore, Dendy misappropriated Kord's trade secrets by theft and improper means.

73.    Upon information and belief, Dendy has used or disclosed Kord's trade secrets while working for and in preparation to work for ATA, without Kord's express or implied consent.  Further, Dendy's efforts to conceal his misdeeds show that he plans to harm Kord by using or disclosing its trade secrets. Alternatively and/or additionally, Dendy will inevitably use or disclose Kord's trade secrets (without Kord's express or implied consent) because his position with ATA is substantially similar to his previous position with Kord and because he is working on the same competitive programs that he supported at Kord.  The circumstances of Dendy's departure and misappropriation show a concrete intent to use or disclose Kord's trade secrets.

74.    Upon information and belief, ATA acquired Kord's trade secrets from Dendy with knowledge, or reason to know, that he obtained them through improper means.  Alternatively and/or additionally, also upon information and belief, ATA used or disclosed, allowed Dendy to use or disclose on its behalf, or plan to so use or disclose, Kord's trade secrets, without Kord's express or implied consent.  And ATA did (or will do) so with knowledge, or reason to know, that Dendy (a) acquired them through improper means; (b) acquired them under

circumstances giving rise to a duty to maintain their secrecy or limit their use; and/or (c) owed Kord a duty to maintain their secrecy.  In any one or more of these ways, ATA also misappropriated Kord's trade secrets.

75.    Kord has suffered injury and damage as a proximate result of Dendy's and ATA's misappropriation and will be irreparably harmed without injunctive or other equitable relief to prevent further use or disclosure of its trade secrets.

WHEREFORE, Kord demands judgment against Dendy and ATA, separately and severally, awarding

(a)    injunctive relief

(i)    enjoining Dendy and ATA from disclosing any of Kord's trade secrets in any way, to include distributing, transferring, disclosing, selling, publishing or describing them to any person or entity;

(ii)    prohibiting Dendy and ATA from obtaining any additional Kord trade secrets, or using them in any way, including copying, printing, modifying, opening or viewing them in any format or medium;

(iii)    allowing an inspection of Dendy's and ATA's (including any applicable affiliate's or agent's) systems, servers and devices to identify any Kord trade secret in his/its possession;

(iv)    requiring Dendy and ATA to remove and return all of Kord's trade secrets in his/its/their possession (to include any copies and, only upon entry of a final judgment or specific direction from the Court, deletion of any remaining copies or versions of the trade secrets); and

(v)    allowing Dendy to remain employed by ATA, but restraining him from working, directly or indirectly, on any of ATA's competitive laser weapons systems program, for at least two years;

(b)    compensatory damages consistent with 18 U.S.C. § 1836(b)(3)(B);

(c)    exemplary damages consistent with 18 U.S.C. § 1836(b)(3)(C); and

(d)    such other and further relief, at law or equity, that the Court deems just and proper.

## Count II - Violation of the Computer Fraud and Abuse Act
## 18 U.S.C. § 1030

76.    Kord adopts and incorporates by reference the allegations in the preceding paragraphs, as if fully set out herein.

77.    Kord's SharePoint Online system is a "protected computer" as defined in 18 U.S.C. § 1030(e)(1 & 2).  Kord uses it, non-exclusively, for the United States government.  Dendy's actions affect the use for the government.  Kord uses the

SharePoint Online system in interstate commerce and to affect interstate commerce or communication, particularly related to U.S. government contracts.

78.     As described above, though Dendy had the privileges necessary to access the DES Files on Kord's SharePoint Online system, he could only do so for Kord's business purposes.  Dendy had no legitimate business purpose for accessing thousands of those files in the early hours of November 13, and certainly not for downloading the documents on Exhibit A.  The same is true for downloads on November 12, 18 and 25.  Thus, Dendy's access for non-business purposes exceeded the authorized access Kord granted him to the DES Files on its SharePoint Online system.  Dendy had no authorization when he accessed Kord's systems after November 27 because at that point he was no longer a Kord employee.

79.     During and after his employment with Kord, Dendy intentionally, knowingly and with intent to defraud, accessed the DES Files on Kord's SharePoint Online system, for non-business purposes, without authorization and/or in excess of his authorized access.  By doing so, Dendy affected Kord's use of the DES Files for the U.S. government, and obtained Kord's information and trade secrets which have substantial value in excess of $5,000.00, and otherwise caused Kord to suffer losses in excess of $5,000.00.

80.     Dendy intentionally accessed the SharePoint Online system, without authorization, and recklessly or otherwise caused damage and loss by impairing the availability of data, a program or information, including the indexes to Kord's web applications that Dendy deleted.

81.     As mentioned above, Kord bought the custom Falcon laptop with government dollars, and used it exclusively to support the U.S. Army on the DE-MSHORAD program.  The Falcon was also used in interstate commerce. Therefore, the Falcon laptop was a "protected computer."

82.     On November 23, while he was still employed with Kord, Dendy intentionally accessed the Falcon laptop and reinstalled its operating system, effectively erasing the data stored on it.  There was no business purpose whatsoever for that action, which substantially exceeded Dendy's authorized access to that laptop.  Dendy's actions affected Kord's use of the Falcon laptop for the U.S. government.

83.     Kord also used the ASUS laptop, non-exclusively, for the U.S. government, and in interstate commerce and to affect interstate commerce or communication, particularly related to U.S. government contracts.  Therefore, the ASUS laptop is also a "protected computer."

84.    Kord owns the ASUS laptop.  Dendy was allowed to use it for business purposes but had no authorization to use it after he left Kord.

85.    After his employment ended, Dendy intentionally accessed the ASUS laptop, without authorization, and recklessly or otherwise caused damage and loss by reinstalling the operating system.  By doing so, Dendy impaired the availability of data, programs and information — all of it — previously stored on the ASUS laptop.

86.    Dendy violated the Computer Fraud and Abuse Act in all of the ways described above.

WHEREFORE, Kord demands judgment against Dendy awarding

(a)    injunctive relief

(i)    enjoining Dendy and anyone acting in concert with him from any attempt to access Kord's network; and

(ii)    enjoining Dendy and anyone acting in concert with him from any attempt to damage Kord's network or any protected computer connected thereto;

(b)    compensatory damages sufficient to compensate Kord for its injuries and damages, according to proof; and

(c)     such other and further relief, at law or equity, that the Court deems just and proper.

## Count III – Violation of Alabama Trade Secrets Act
## Ala. Code § 8-27-1, *et seq.*

87.     Kord adopts and incorporates by reference the allegations in the preceding paragraphs, as if fully set out herein.

88.     As discussed above, the DES Files and information that Dendy downloaded from Kord's SharePoint Online system contained Kord's Proprietary Tracking Technology along with other proprietary information.  That information is a trade secret under the Alabama Trade Secrets Act because (as also discussed above):

   a.     Kord uses it, and intends to use it, in its business;

   b.     it is embodied in formulas, compilations, computer software, techniques and/or processes;

   c.     it is not publicly known or even generally known in the directed energy industry;

   d.     it cannot be readily ascertained or derived from publicly available information;

e.  Kord took reasonable steps to protect it and maintain its secrecy; and

f.  it has significant economic value.

89. Dendy misappropriated Kord's trade secrets by using or disclosing them, or threatening to use or disclose them, in breach of the confidence Kord reposed in him when it gave him access to the information in the first place.

90. Upon information and belief, ATA knowingly learned or acquired Kord's trade secrets from Dendy and knew or should have known that (a) they were trade secrets and (b) that Dendy's disclosure breached a confidence Kord reposed in him.  Additionally and/or alternatively, ATA obtained Kord's trade secrets by improper means by inducing Dendy to use or disclose them in breach of Kord's confidence.  After acquiring Kord's secrets, upon information and belief, ATA used or disclosed, allowed Dendy to use or disclose on its behalf, or plan to so use or disclose, Kord's trade secrets.  In all these ways, ATA misappropriated Kord's trade secrets.

91. Kord has suffered injury and damage as a proximate result of Dendy's and ATA's misappropriation and will be irreparably harmed without injunctive or other equitable relief to prevent further use or disclosure of its trade secrets.

WHEREFORE, Kord demands judgment against Dendy and ATA, separately and severally, awarding

(a)     injunctive relief

(i)     enjoining Dendy and ATA from disclosing any of Kord's trade secrets in any way, to include distributing, transferring, disclosing, selling, publishing or describing them to any person or entity;

(ii)     prohibiting Dendy and ATA from obtaining any additional Kord trade secrets, or using them in any way, including copying, printing, modifying, opening or viewing them in any format or medium;

(iii)     allowing an inspection of Dendy's and ATA's (including any applicable affiliate's or agent's) systems, servers and devices to identify any Kord trade secret in his/its possession;

(iv)     requiring Dendy and ATA to remove and return all of Kord's trade secrets in his/its/their possession (to include any copies and, only upon entry of a final judgment or specific direction from the Court, deletion of any remaining copies or versions of the trade secrets); and

(v)     allowing Dendy to remain employed by ATA, but restraining him from working, directly or indirectly, on any of ATA's competitive laser weapons systems program, for at least two years;

(b)     compensatory damages consistent with Ala. Code § 8-27-4(a)(1);

(c)     reasonable attorneys' fees in accordance with Ala. Code § 8-27-4(a)(2);

(d)     exemplary damages consistent § 8-27-4(a)(3); and

(e)     such other and further relief, at law or equity, that the Court deems just and proper.

### Count IV- Violation of the Alabama Digital Crime Act
### Ala. Code § 13A-8-110, *et seq.*

92.     Kord adopts and incorporates by reference the allegations in the preceding paragraphs, as if fully set out herein.

93.     Kord's SharePoint Online system is a "Computer," "Computer Network" or "Computer System" as defined by the Alabama Digital Crimes Act ("ADCA").  *See* Ala. Code §§ 13A-8-111(2), (3) & (8).  The Falcon and ASUS laptops that Kord issued to Dendy are each a "Computer" as defined by the ADCA.

94.     As discussed above, Kord granted Dendy privileges to the DES Files on its SharePoint Online system, to be used only for Kord's legitimate business purposes.  As also discussed above, Dendy exceeded his authorized use of Kord's SharePoint Online system during his employment because he was not entitled to access it — as defined by the ADCA, § 13A-8-111(1) — and download or obtain documents from Kord's DES Files without a legitimate business purpose.  He had no authorization to access Kord's systems after November 27.  Yet he knowingly did so.

95.     Dendy knew or should have known that the documents he downloaded or obtained from Kord's SharePoint Online system contained Kord's trade secret and proprietary information.

96.     Dendy was not authorized to alter, delete, damage or destroy the computer programs and data stored on the SharePoint Online system.  But he knowingly and intentionally did just that when he deleted, among other things, the index files for Kord's web applications.

97.     Similarly, Dendy was not authorized to alter, delete, damage or destroy the computer programs and data stored on the Falcon or ASUS laptop.  Yet he knowingly and intentionally did so when he reinstalled the operating systems on the laptops before returning them to Kord.

98.     In all the ways discussed above, Dendy violated the ADCA and caused harm to Kord.

99.     Kord has expended more than $2,500.00 because of Dendy's misconduct, and will likely spend more than $100,000.00 to redress his wrongdoing.

100.    Because Dendy's actions caused damage to Kord's property, breached his fiduciary duty (discussed below) and otherwise violated Kord's property rights in and to its information, trade secrets, Computers, Computer Networks and Computer Systems, Kord can bring this claim against Dendy.  *See* Ala. Code § 6-5-70 (1975); *Sunil Gupta, M.D., LLC v. Franklin,* No. CV 17-00335-N, 2017 WL 5196392, at *8–9 (S.D. Ala. Nov. 9, 2017); *Pixsys Techs., Inc. v. Agemni, L.L.C.*, No. 2:13-CV-1929-SLB, 2013 WL 5739027, at *4 (N.D. Ala. Oct. 22, 2013).

WHEREFORE, Kord demands judgment against Dendy in an amount sufficient to compensate it for its injuries and damages, along with punitive damages in an amount sufficient to punish Dendy and deter future misconduct, and such other and further relief, at law or equity, that the Court deems just and proper.

## Count V – Conversion

101.   Kord adopts and incorporates by reference the allegations in the preceding paragraphs, as if fully set out herein.

102.   Kord recognizes that its claims under the Defend Trade Secrets Act and the Alabama Trade Secrets Act preempt common law claims for misappropriation of trade secrets.  *See Parker v. Petrovics,* No. 2:19-CV-00699-RDP, 2020 WL 3972761, at *9 (N.D. Ala. July 14, 2020).  Some of the thousands of documents that Dendy downloaded from Kord's SharePoint Online system are not trade secrets under either act.  However, Kord still owns those documents, and they are proprietary and valuable.  And neither the Defend Trade Secrets Act nor its Alabama counterpart will afford Kord a remedy for Dendy's wrongful taking and use of those non-trade secrets.  However, the Alabama Constitution of 1901, § 13 guarantees the right to a remedy for every wrong done.  Accordingly, Kord asserts Count V only as to the valuable non-trade-secret documents and information that Dendy wrongfully took from Kord.

103.   Intangible property, like the documents Dendy downloaded without permission from Kord's SharePoint Online system, is subject to conversion.  *See* Ala Code. § 6-5-260*; Nat'l Sur. Corp. v. Applied Sys., Inc.*, 418 So. 2d 847, 849–50 (Ala. 1982).

104.    When he downloaded those documents, Dendy intentionally and wrongly took, illegally assumed ownership of, withheld and converted Kord's property.  Kord owned and possessed the documents and information that Dendy downloaded, and did not consent to Dendy downloading them for non-business purposes.

105.    Kord has suffered injuries and damages as a proximate consequence of Dendy's actions.

WHEREFORE, Kord demands judgment against Dendy in an amount sufficient to compensate it for its injuries and damages, along with punitive damages in an amount sufficient to punish Dendy and deter future misconduct, and such other and further relief, at law or equity, that the Court deems just and proper.

## Count VI – Unjust Enrichment

106.    Kord adopts and incorporates by reference the allegations in the preceding paragraphs, as if fully set out herein.

107.    As with Count V, Kord brings this Count VI as to the non-trade-secret documents and information that, upon information and belief, ATA obtained from Dendy.  Under the circumstances, ATA knew or should have known that Dendy

was using or disclosing Kord's valuable intangible property as part of his work for ATA.

108.   ATA benefitted from Dendy's use or disclosure of Kord's documents and information and has wrongfully obtained and retained that benefit.  As such, ATA has been unjustly enriched.

WHEREFORE, Kord demands judgment against ATA in an amount sufficient to disgorge any benefit unjustly obtained/retained, and such other and further relief, at law or equity, that the Court deems just and proper.

### Count VII – Statutory Detinue

109.   Kord adopts and incorporates by reference the allegations in the preceding paragraphs, as if fully set out herein.

110.   Upon information and belief, Dendy is in possession of materials that contain Kord's property, specifically its proprietary information.  Also upon information and belief, Dendy disclosed and shared materials containing Kord's proprietary information with ATA.

111.   Dendy tried to conceal the fact that he downloaded documents from the DES Files on Kord's SharePoint Online system.  Upon information and belief, Dendy used the ASUS laptop that he took with him to ATA for those downloads.

But Dendy re-installed the operating system before returning the ASUS laptop (almost a full month after he left Kord).  The files and materials that Dendy took from Kord are unaccounted for as of this filing, and Dendy refuses to return them.

112.   Pursuant to Ala. Code. §§ 6-6-250, *et seq.* and Rule 64, Fed. R. Civ. P., Kord is entitled to recover any documents and tangible materials in Dendy's and/or ATA's possession that contain its trade secrets or proprietary information.

WHEREFORE, Kord requests that the Court

(a)     require Dendy and ATA to return Kord's property and/or issue an Order directing that it be seized and returned;

(b)     award Kord compensatory damages in an amount sufficient to compensate it for its injuries and damages;

(c)     award Kord punitive damages in an amount sufficient to punish Dendy and ATA and deter future misconduct; and

(d)     award Kord such other and further relief, at law or equity, that the Court deems just and proper.

## Count VII – Trespass to Chattels

113.   Kord adopts and incorporates by reference the allegations in the preceding paragraphs, as if fully set out herein.

114.   Kord owns the ASUS laptop it issued to Dendy, and all the information on it.  As described above, Dendy wrongfully dispossessed Kord of the ASUS laptop by retaining it when he separated from Kord.

115.   As discussed above, Dendy damaged the ASUS laptop by reinstalling its operating system before returning it to Kord.  Doing so essentially erased the information — also Kord's property — on the ASUS laptop.  Upon information and belief, some of the information Dendy erased is now permanently unavailable to Kord.  Dendy's trespass damaged Kord.

WHEREFORE, Kord demands judgment against Dendy in an amount sufficient to compensate it for its injuries and damages, along with punitive damages in an amount sufficient to punish Dendy and deter future misconduct, and such other and further relief, at law or equity, that the Court deems just and proper.

## Count VIII – Breach of Fiduciary Duty

116.   Kord adopts and incorporates by reference the allegations in the preceding paragraphs, as if fully set out herein.

46

117.   As a Kord employee, Dendy had a fiduciary duty to act in Kord's best interests, with the utmost good faith and loyalty.  Dendy breached that fiduciary duty by, among other things, secretly communicating with Mr. Lloyd and ATA about Kord business, and working on ATA's behalf while still employed with Kord.

118.   Dendy also breached his fiduciary duty by intentionally violating Kord's policies and procedures for protecting proprietary information, including specifically (but without limitation) its Employee Manual and Standards of Business Conduct and Ethics.

119.   In particular, but without limitation, Dendy violated Kord's policies and procedures, and otherwise breached his fiduciary duty, by reinstalling the operating system on the Falcon laptop during his employment.  Dendy had no legitimate business purpose for that action, which was contrary to Kord's best interests.

120.   Kord suffered injuries and damages as a proximate consequence of Dendy's breaches.

WHEREFORE, Kord demands judgment against Dendy in an amount sufficient to compensate it for its injuries and damages, along with punitive

damages in an amount sufficient to punish Dendy and deter future misconduct, and such other and further relief, at law or equity, that the Court deems just and proper.

## Count IX – Intentional Interference with Business Relations
## (ATA)

121.   Kord adopts and incorporates by reference the allegations in the preceding paragraphs, as if fully set out herein.

122.   Kord maintains business relationships with its government customers, particularly the U.S. Air Force for its HEL SWORD program.  ATA knows about that relationship, and is a stranger to it.  In fact, ATA is a direct competitor with respect to that relationship with its LOCUST program.

123.   Dendy played a central role in Kord's ongoing effort to obtain a Phase 2 production contract for its HEL SWORD program with a value in the hundreds of millions of dollars.  Dendy was customer facing and knew Kord's strategy and approach for that acquisition.

124.   Upon information and belief, ATA intentionally interfered with Kord's relationship with its Air Force customer by, among other things, inducing Dendy to work on a competing program for ATA, **while he was still employed by Kord.**  And now Dendy is working in a virtually identical role, for Kord's direct competitor, and is armed with thousands of documents containing Kord's

proprietary information.  If allowed to continue, it is inevitable that Dendy (including without limitation, as ATA's agent and acting in concert with ATA) will use or disclose that information to unfairly harm Kord's chances of winning the Phase 2 production contract.

125.   ATA's actions were not justified or protected by the competitor's privilege or otherwise, and instead constitute wrongful, tortious interference with business relations — not permissible, lawful competitive practices.

126.   Kord suffered injuries and damages as a proximate consequence of ATA's actions.

WHEREFORE, Kord demands judgment against ATA in an amount sufficient to compensate it for its injuries and damages, along with punitive damages in an amount sufficient to punish them and deter future misconduct, and such other and further relief, at law or equity, that the Court deems just and proper.

### Count X – Intentional Interference with Business Relations (Dendy)

127.   Kord adopts and incorporates by reference the allegations in the preceding paragraphs, as if fully set out herein.

128.   Kord maintains a business and contractual relationship with its U.S. Army customer on the DE-MSHORAD program.  Dendy knows of that relationship and is a stranger to it.

129.   On or about November 23, Dendy reinstalled the operating system on the government funded Falcon laptop Kord used exclusively to support the DE-MSHORAD program and customer.  The contents of the Falcon laptop are no longer available to Kord.  And, upon information and belief, due to Dendy's other deletions of data, some of that information may not be available to Kord at all. The loss of important data will affect Kord's ability to perform the DE-MSHORAD contract.

130.   When Dendy erased the Falcon's data, he had already accepted a position with ATA, which is a direct competitor to Kord in the DES space.  Had Kord known this — that is, if Dendy had been honest with Kord about his future employment plans — it would have terminated Dendy's access immediately on November 20.  And in that event, Dendy would not have been able to erase the Falcon laptop's contents.

131.   Because ATA is Kord's subcontractor on the DE-MSHORAD program, it would be in a position to acquire additional or future work from the customer should Kord fall out of favor.  Upon information and belief, Dendy's

actions were designed to damage Kord's relationship with its government customer and improve ATA's prospects for future work.

132.   A significant number of the documents Dendy improperly downloaded from Kord's DES Files relate to the DE-MSHORAD program and contain Kord's proprietary information.  Aided by the proprietary materials that he should not have, Dendy is positioning ATA to obtain work from the DE-MSHORAD customer.

133.   Dendy's repetitive, pattern of malicious conduct, outside the line and scope of his employment, is intentional interference under Alabama law, even if Dendy is not a stranger to Kord's business and contractual relationships.

134.   Kord suffered injuries and damages as a proximate consequence of Dendy's actions.

WHEREFORE, Kord demands judgment against Dendy in an amount sufficient to compensate it for its injuries and damages, along with punitive damages in an amount sufficient to punish him and deter future misconduct, and such other and further relief, at law or equity, that the Court deems just and proper.

## Count XI – Civil Conspiracy

135.   Kord adopts and incorporates by reference the allegations in the preceding paragraphs, as if fully set out herein.

136.   Dendy conspired and worked together with ATA to misappropriate Kord's trade secrets (Counts I and III), wrongfully obtain and convert its proprietary information (Count V), trespass to Kord's chattels (Count VII), breach his fiduciary duties (Count VIII) and interfere with Kord's business relations (Count IX).  Dendy took the affirmative steps described above in furtherance of that conspiracy.  Meanwhile, ATA assisted, supported, encouraged, and/or planned those actions with Dendy.

137.   Dendy and ATA intended to harm Kord, not just to act in their own self interests.  And Dendy's conduct, in furtherance of the conspiracy, caused Kord injury and damages.

WHEREFORE, Kord demands judgment against Dendy and ATA, separately and severally, in an amount sufficient to compensate it for its injuries and damages, along with punitive damages in an amount sufficient to punish them and deter future misconduct, and such other and further relief, at law or equity, that the Court deems just and proper.

## Jury Demand

Kord demands a jury trial on all claim so triable.

Respectfully submitted,

/s/ W. Brad English
W. Brad English (ASB-5240-A43E)
Emily J. Chancey (ASB-3029-E64J)
Robert G. Jones (ASB-6557-B34J)
Michael W. Rich (ASB-0880-D77I)

**OF COUNSEL:**
MAYNARD, COOPER & GALE, P.C.
655 Gallatin Street
Huntsville, Alabama 35801
Telephone:  (256) 512-5705
benglish@maynardcooper.com
echancey@maynardcooper.com
rjones@maynardcooper.com
mrich@maynardcooper.com

/s/ Vineet Bhatia
Vineet Bhatia
(Texas State Bar No. 00795976)
Geoffrey L. Harrison
(Texas State Bar No. 00785947)
(Applications for admission pro hac
    vice forthcoming)

**OF COUNSEL:**
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, Texas 77002-5096
Telephone:  (713) 651-9366
Email:  vbhatia@SusmanGodfrey.com
        gharrison@SusmanGodfrey.com

*Attorneys for Plaintiff Kord Technologies, LLC*

## VERIFICATION

I, Scott Schnorrenberg, pursuant to 28 U.S.C. § 1746, declare as follows.

1.      I am an adult resident of Madison County, Alabama.

2.      I am the president of Kord Technologies, LLC.  I am authorized to execute this Verified Complaint on Kord's behalf.

3.      I have reviewed the factual matters in paragraphs 9-31, 33-36, 38, 40, 44-51, 55-58, 62 and 65-67 of the Verified Complaint, and declare under penalty of perjury they are true and correct to the best of my personal knowledge.  Note that my personal knowledge consists of information that (a) I personally learned contemporaneous to the events described in the Verified Complaint, (b) I personally learned in the performance of my job; and (c) I personally learned by participating in Kord's investigation of the facts described.

Executed in Huntsville, Alabama this 5th day of January 2021.

Scott Schnorrenberg

## VERIFICATION

I, Raj Gandhi, pursuant to 28 U.S.C. § 1746, declare as follows.

1.      I am an adult resident of Montgomery County,
Texas.

2.      I am the Senior Manager for IT eDiscovery and Security for KBR,
which is Kord Technologies, LLC's ultimate parent company.  I am authorized to
execute this Verified Complaint on Kord's behalf.

3.      I have reviewed the factual matters in paragraphs 17, 19, 37, 39, 41-
43, 52-54 and 60 of the Verified Complaint, and declare under penalty of perjury
they are true and correct to the best of my personal knowledge.  Note that my
personal knowledge consists of information that (a) I personally learned
contemporaneous to the events described in the Verified Complaint, (b) I
personally learned in the performance of my job; and (c) I personally learned by
participating in Kord's investigation of the facts described.

Executed in Houston, Texas this 5th day of January, 2021.

_____
Raj Gandhi

57

## CERTIFICATION OF RECORD RETENTION

Pursuant to Northern District of Alabama CM/ECF Procedures Rule II.C.2, undersigned counsel hereby certifies that the original signed and verified complaint, with all formalities, is currently held at the offices of Maynard, Cooper & Gale, P.C. (as to Scott Schnorrenberg's verification page) and Susman Godfrey, LLP (as to Raj Ghandi's verification page) at the addresses indicated above.

/s/ W. Brad English
Of Counsel

/s/ Vineet Bhatia
Of Counsel